# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| VISIM INCORPORATED<br>d/b/a WATERLOO MANUFACTURING SOFTWARE,<br><br>           Plaintiff<br><br>      v.<br><br>PLEX SYSTEMS, INC.,<br><br>           Defendant. | CIVIL ACTION NO.<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Visim Incorporated d/b/a Waterloo Manufacturing Software ("Waterloo") complains against the Defendant Plex Systems, Inc. ("Plex"), as follows:

This action arises under the federal Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 (the "DTSA"), and related state law claims resulting from Plex's misappropriation of Waterloo's trade secrets and proprietary business information and Plex's breach of contract.

## THE PARTIES

1.  Waterloo is an Ohio corporation with its principal place of business at 4740 Fay Drive, South Euclid, Ohio. Plaintiff is in the business of developing, marketing, and supporting finite capacity scheduling ("FCS") software, also known as Advanced Production Scheduling ("APS") software. Waterloo sells its FCS software under the trade name "TACTIC."

2.  Upon information and belief, Plex is a Delaware corporation with its principal place of business at 900 Tower Drive, Suite 1400 Troy, Michigan. Upon information and belief, before 2009, Plex was known as "Plexus Systems." Plex offers manufacturing enterprise

1

resource planning ("ERP") software, which includes production planning and scheduling features.

## JURISDICTION AND VENUE

3. This Court has original subject matter jurisdiction of this matter pursuant to 18 U.S.C. § 1836(b) because the case arises under the DTSA.

4. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367(a) because they are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy.

5. This Court has personal jurisdiction over Plex because Plex is a Delaware corporation.

6. Venue in this Court is appropriate pursuant to 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

**I.     Development of Waterloo's Trade Secrets and Proprietary TACTIC Software**

7. Generally speaking, Waterloo's TACTIC software provides Waterloo's customers with resource scheduling capabilities that factor in complex real-world capacity constraints, such as machines, tools, labor, and material.  For example, with TACTIC, Waterloo's customers can better control overtime costs, shorten lead times, improve customer service, reduce inventory, improve utilization, justify capital, and reduce schedule generation times.

8. Since 1991, Waterloo has spent enormous resources developing proprietary and valuable technical information, including data structures, algorithms, methods, techniques, processes, and other valuable trade secrets (the "Waterloo Trade Secrets"), to transform TACTIC into a world-class FCS system.  Waterloo spends over 30% of its revenue on development.

9. Waterloo has maintained, and continues to maintain, strict confidentiality restrictions around access to the Waterloo Trade Secrets. Waterloo's confidentiality measures include the following protocols:

- Requiring all licensed users to accept the Waterloo License Agreement, which includes strict confidentiality and non-copying provisions;
- Requiring all parties requesting documentation or trial software to sign a non-disclosure agreement;
- Requiring partners or resellers to enter into a reseller agreement, which includes strict confidentiality provisions; and
- Refusing to offer TACTIC documentation online and never releasing any TACTIC demonstration software.

10. The Waterloo Trade Secrets derive independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

11. The Waterloo Trade Secrets are related to products and services used in and intended for use in both interstate and foreign commerce.

12. Waterloo has expended substantial time, personnel, money, and other resources to develop and maintain the Waterloo Trade Secrets.

**II.   Plex's Access to the Waterloo Trade Secrets Under Confidentiality Agreements**

13. Since 2002, Waterloo and Plex have worked in a partnership in which Waterloo provides TACTIC to Plex's customers through Plex's ERP system.

14. Throughout the partnership, Waterloo intended—and Plex claimed that it intended—that TACTIC would be the permanent scheduling engine for Plex's ERP system. For this reason, Waterloo allowed Plex to build its FCS-related database fields to mirror the TACTIC database fields. This necessarily gave Plex access to Waterloo's proprietary data structures, algorithms, and other Waterloo Trade Secrets, but always under an obligation not to use those

Trade Secrets except as expressly authorized by Waterloo. In addition, Waterloo provided extensive training to Plex employees, in particular an employee named Ian Taylor, which included disclosures of Waterloo's trade secret information that were necessary for Plex employees to develop the Plex portion of the data interface with TACTIC and support Plex's customers using TACTIC.

### A. Waterloo and Plex Enter into a Confidential Relationship: The Weber Project (2002)

15. In 2001, Robert Beatty, founder and then-president of Plexus Systems (renamed Plex Systems, Inc. in 2009), first approached Waterloo's management. Plexus wished to license its Plexus Online software ("POL") to a third party, Weber Metals. Weber, however, would not license POL without FCS capability. Plexus therefore wished to incorporate Waterloo's TACTIC software into POL Plexus told Waterloo that it needed to demonstrate FCS capability no later than May 2002.

16. In January 2002, Waterloo and Plex signed a Strategic Partnership agreement. **Exh. A**, Jan. 7, 2002 Strategic Partnership Agreement. Under this Strategic Partnership agreement, Plexus agreed that it would keep TACTIC confidential:

> Plexus will make no disclosure of Tactic, documentation, or Waterloo practices and procedures to any other companies, or their respective subsidiaries or affiliates, which are involved in developing, selling, marketing or distributing software for manufacturing planning and scheduling.

*Id.* at 2.

17. Waterloo issued to Plexus a Quotation 30102-1, through which Waterloo offered to provide consulting, enhancement, and training services necessary to achieve the goals of the strategic partnership. **Exh. B**, Jan. 7, 2002 Strategic Partnership Quote 30102-1. Quotation 30102-1 included the Waterloo Manufacturing Software License and Maintenance Agreement.

4

*Id.* at 4.  Pursuant to the Waterloo Manufacturing Software License and Maintenance Agreement, the licensee (Plexus) agreed to still further confidentiality restrictions:

> 2.2  By written acceptance of Licensee's order for a System, WMS [*i.e.*, Waterloo] will grant to Licensee a nonexclusive, nontransferable license to use the System at Licensee's locations. …
>
> 2.3  Licensee may use the System only in connection with the operation, management and marketing of Licensee's business. Licensee may not permit others to use the System on a time sharing, rental or other basis.  Licensee may not assign, sublicense or otherwise transfer any license or right granted hereunder without WMS's express written consent. Licensee shall limit the use of and access to the System to such employees and consultants as are required to be directly involved in the operation of the System.  Licensee shall require its employees and consultants to **make no disclosure of the System or manuals and other documentation to others.** …
>
> 2.5  Licensee shall **not copy the System's software programs** or manuals and other documentation without WMS's express written consent, except as may be required in the operation of the System.   Licensee shall not modify or remove any copyright or proprietary rights notice included in the System's software programs, manuals and other documentation.  Licensee shall **not attempt to reverse compile, reverse assemble or otherwise generate or use** any of the System's software program source code or attempt to copy or otherwise tamper with a software security device.
>
> 2.6  … Upon termination, Licensee shall promptly return copies of any System's software programs, manuals and other documentation and security devices covered by such license.

*Id.* (emphases added).

18.    On January 9, 2002, Plexus issued Purchase Order 3170, accepting Waterloo's offer and the terms of Quotation 30102-1.  **Exh. C**, Jan. 9, 2002 Strategic Partnership Purchase Order ("Description: TACTIC Scheduling System, plus enhancements & services as per Waterloo quote 30102 Jan 7 and Strategic Partnership Agreement Jan 7").

19.    TACTIC provided all of the functionality required by Weber.  The only remaining task was integrating TACTIC with POL.  This integration, called the "POL/TACTIC interface," was essentially a series of procedures that would allow TACTIC to receive data from POL and return result data back to POL.

20. Upon information and belief, Weber ultimately entered into a perpetual license agreement for Plexus Online that included Waterloo's TACTIC module.

21. Throughout the Weber project, Plexus employees received valuable and confidential technical information from Waterloo regarding TACTIC and Waterloo's FCS/APS technology.

22. In 2003, Plexus approached Waterloo to discuss a merger to bring Waterloo's FCS/APS expertise in-house to Plexus. Ultimately, the parties decided not to go forward with the merger. Instead, Plexus continued its relationship with Waterloo.

B.  <u>The Confidential Relationship Continues:  The RSDC Project (2008)</u>

23. In 2008, Plexus requested Waterloo's assistance in closing a sale with Regional Steel Distribution Center ("RSDC"). At that time, RSDC was a Waterloo customer. RSDC would not license Plexus Online unless RSDC could continue to use Waterloo's TACTIC scheduling module in conjunction with Plexus Online. With Waterloo's assistance, Plexus successfully negotiated an agreement with RSDC.

24. In March 2008, Waterloo and Plexus signed a Software Hosting Agreement, whereby Waterloo transferred its own license with RSDC to Plexus. **Exh. D**, Mar. 28, 2008 Software Hosting Agreement. Per this 2008 agreement, Plexus once again agreed that it would not reverse engineer Waterloo's software and would keep it confidential:

> 6. Plexus shall not copy TACTIC software programs or manuals and other documentation without WMS's express written consent, except as may be required in the operation of TACTIC for RSDC. Plexus shall not modify or remove any copyright or proprietary rights notice included in TACTIC software programs, manuals and other documentation. **<u>Plexus shall not attempt to reverse compile, reverse assemble, reverse engineer, or otherwise generate or use</u>** any of TACTIC'S software program source code or attempt to copy or otherwise tamper with a software security device

*Id.* at 1 (emphasis added).

25.     In August 2008, Waterloo trained Plexus staff on the use of TACTIC at RSDC. Upon information and belief, RSDC continues to use TACTIC in conjunction with Plex manufacturing ERP software.

26.     In 2009, Plexus Systems changes its name to Plex Systems, Inc.

C.     <u>Plex, and in Particular Ian Taylor, Access Waterloo's Trade Secrets:  The SFI Project (2010-2015)</u>

27.     In late 2010, senior management at SFI Tennessee, LLC ("SFI") contacted Waterloo to discuss the capabilities of TACTIC and to verify that Plex used TACTIC for scheduling. SFI, a prospective Plex customer, was concerned that Plex's service would not have the scheduling capabilities that SFI required.

28.     Within a few weeks, Waterloo, Plex, and Baker Tilly—a consultant hired by SFI to implement Plex at SFI—began negotiations. The negotiations took place under the terms of non-disclosure agreements between Waterloo and Plex and between Waterloo and Baker-Tilly (**Exh. E**, Mar. 2011 Waterloo / Baker-Tilly NDA).

29.     In December 2010, Baker Tilly provided a list of SFI's required FCS capabilities. While the TACTIC system met all of SFI's numerous requirements, the POL/TACTIC interface existing at that time would not allow SFI to use all of TACTIC's capabilities.

30.     From early 2011 until 2013, Waterloo worked to make the changes to the Plex / TACTIC interface necessary to supply SFI with the desired TACTIC functionality. A Plex employee named Ian Taylor acted as Waterloo's principal contact in developing and implementing the changes to the POL/TACTIC interface.

31. For two years, Waterloo provided detailed technical information about TACTIC's features, data structures, algorithms, and outputs to Plex, and Mr. Taylor in particular, through hundreds of emails and telephone conferences. Providing this information was necessary to enhance the POL/TACTIC interface. Mr. Taylor received sufficient confidential and proprietary information regarding TACTIC such that he was ultimately able to teach others at Plex, SFI, and Baker Tilly—all entities in a confidentiality relationship with Waterloo—about the behind-the-scenes confidential workings of TACTIC.

32. At Plex's request, Waterloo did not charge for its extensive work in enhancing the POL/TACTIC interface for the SFI project. In addition to the work on the interface, Waterloo also agreed to make changes at no charge that allowed Plex to optimize the use of TACTIC on Plex's servers, minimizing Plex's hosting costs.

33. Throughout 2013, in order to help Plex develop new potential customers, Waterloo provided more and more valuable technical assistance and expertise to Plex. Plex routinely requested that Waterloo lower its costs for Plex's potential clients. At all times, Waterloo disclosed its trade secrets and other confidential information to Plex under a non-disclosure agreement.

34. In August 2013, while Plex was in negotiations with a potential customer, Polamer Precision, Inc. ("Polamer"), Polamer requested access to TACTIC's capability to generate schedules that minimize production equipment changeovers. To assist Plex to get the Polamer business, Waterloo provided to Plex—through Mr. Taylor—the TACTIC scheduling algorithm used to minimize equipment changeovers.

35. The information and materials that Waterloo provided to Plex under the January 2002 strategic partnership agreement, strategic partnership quote 30102-1 (accepted by Plex via

a strategic partnership purchase order in January 2002), the March 2008 software hosting agreement, and the SFI subscription agreement (the "Agreements") included Waterloo Trade Secrets, which are protectable under federal and Delaware law.

36. As detailed above, the Waterloo Trade Secrets are subject to reasonable efforts to maintain their secrecy. The Waterloo Trade Secrets are not known outside of Waterloo, its employees, and others involved in its business and under the terms of a non-disclosure agreement.

37. The Waterloo Trade Secrets would be difficult—if not impossible—for others to legally acquire or independently duplicate.

### III. Plex's Misappropriation of the Waterloo's Trade Secrets and Breaches of the Plex-Waterloo Agreements

38. Upon information and belief, in or around 2013, Plex began to develop its own in-house finite capacity scheduling software, called "Plex Finite Scheduling."

39. Upon information and belief, Plex deliberately used Waterloo's confidential and proprietary business information and valuable trade secrets as the framework for Plex's in-house finite scheduling software. Upon information and belief, Plex copied and used, for its own benefit and to Waterloo's detriment, Waterloo's proprietary data structures, algorithms, and other trade secrets, and reverse engineered Waterloo's source code, in breach of the Agreements.

40. Waterloo's confidential and proprietary FCS/APS data structures were built into the Plex Online system as part of Plex's partnership with Waterloo. Plex's copycat in-house FCS module uses these Waterloo confidential and trade secret data structures, algorithms, and other trade secrets, misappropriating Waterloo's Trade Secrets.

41. Plex's in-house FCS module copies the features and functionality of Waterloo's TACTIC software, including valuable trade secrets and other confidential and proprietary business information, that Plex could only have learned about under its confidentiality agreements with Waterloo. For example, Plex has copied TACTIC's algorithms for consuming and reporting labor resources and parameters for defining labor resource availability and associating jobs for batch processing and sequencing.

42. Upon information and belief, Ian Taylor—the Plex employee who received the greatest access to Waterloo's trade secrets over a period of several years—designed Plex's copycat in-house FCS system.

43. Upon information and belief, Plex developed its copycat FCS system in fewer than 3 years. By contrast, Waterloo spent over fifteen years and millions of dollars in developing the proprietary TACTIC system, including the features and functionality copied by Plex. Without access to Waterloo's trade secrets, Plex could not possibly have developed its copycat system in so short a period of time.

44. Plex has used its copycat in-house FCS system to steal Waterloo's customers and revenue sources. For example, in 2015, SFI acquired a new manufacturing plant. SFI had been using TACTIC, but Plex convinced SFI to use Plex's copycat in-house FCS system instead of TACTIC in the new plant. Ultimately, Plex's copycat in-house FCS system supplanted TACTIC at all SFI plants.

45. Finally, in addition to stealing and using Waterloo's trade secrets to develop its copycat in-house FCS system, Plex has breached its agreements with Waterloo by allowing customers access to TACTIC without paying Waterloo. On December 14, 2015, Waterloo received a letter from Plex terminating the relationship with respect to SFI:

> This letter shall serve as formal written notice that Plex Systems, Inc. ("Plex") is terminating its subscription for Advance Production Scheduling (APS) with Waterloo Manufacturing Software ("Waterloo") for its customer SFI Tennessee, LLC ("SFI"), as they will no longer be utilizing APS.
>
> This termination shall be effective December 31, 2015. Accordingly, effective January 1, 2016, Plex will no longer have any payment obligations on behalf of SFI to Waterloo.

**Exh. F**, Dec. 14, 2015 Letter from Donald Clarke (Plex) to Andy Gillman [*sic*] (Waterloo). As SFI's access to TACTIC was by subscription, Plex could no longer (legally) provide TACTIC to SFI after December 31, 2015.

46.   Nevertheless, Waterloo has discovered that Plex continued to provide TACTIC to SFI until at least July 2016. Waterloo has received no compensation whatsoever for SFI's access to TACTIC in 2016.

**COUNT I**
**MISAPPROPRIATION OF TRADE SECRETS UNDER THE**
**DEFENSE OF TRADE SECRETS ACT OF 2016**

47.   Waterloo repeats and realleges the allegations contained in the preceding paragraphs.

48.   While operating under the terms of confidentiality agreements, Plex acquired confidential and proprietary trade secret information related to Waterloo's TACTIC product, which is intended for use in, and used in, interstate and foreign commerce, namely in software systems sold to customers across the United States and abroad.

49.   Waterloo's trade secrets were trade secrets at the time they were misappropriated by Plex.

50.   As expressly acknowledged in the numerous agreements between Waterloo and Plex, Waterloo considers this information to be confidential and proprietary, and it has taken

reasonable steps as part of its ongoing standard operating procedures to maintain the confidential nature of this information.

51. The information Plex received and misappropriated derives independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

52. As a result of Plex's misappropriation of the confidential proprietary and trade secret information, Plex has violated the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836(b)(1).

53. As a direct and proximate result of Plex's violation of the Defend Trade Secrets Act of 2016, Waterloo has sustained and will sustain substantial damages in an amount that will be established at trial of this matter.

54. Plex's actions in converting and misappropriating Waterloo's confidential, proprietary, and trade secret information for its own gain were willful, wanton, and malicious, and were taken with reckless disregard for the rights of Waterloo.

55. Plex's actions have caused and will continue to cause Waterloo irreparable harm if not preliminarily and permanently enjoined.

56. Waterloo has no adequate remedy at law.

## COUNT II
## VIOLATION OF DELAWARE TRADE SECRETS ACT

57. Waterloo repeats and realleges the allegations contained in the preceding paragraphs.

58. Waterloo is the owner of trade secrets as defined by the Uniform Trade Secrets Act, 6 Del. Code Ann. §§ 2001-2009.

59. Waterloo's trade secrets include, but are not limited to, confidential and proprietary technical information relating to Waterloo's TACTIC software.

60. Waterloo's trade secrets derive independent actual and potential economic value from not being generally known or available to the public or other persons who can obtain economic value from their disclosure or use.

61. Waterloo's trade secrets have significant value, resulting from significant investment of time and resources.

62. Waterloo has made, and continues to make, efforts to maintain the secrecy of its trade secrets and such efforts are reasonable under the circumstances.

63. Waterloo's trade secrets as described above were trade secrets at the time they were misappropriated by Plex.

64. As described above, Plex has improperly used, and continues to improperly use, Waterloo's trade secrets without consent.

65. As a direct, natural, and proximate result of Plex's misappropriation, Waterloo has suffered damages in an amount to be proven at trial.

66. Plex's misappropriation of Waterloo's trade secrets has caused and continues to cause Waterloo irreparable harm that cannot be fully redressed through damages alone.  An injunction is necessary to provide Waterloo with complete relief.

67. In misappropriating Waterloo's trade secrets, Plex acted willfully and maliciously.  Plex is liable for punitive and exemplary damages under Section 2003 of Title 6.

**COUNT III**
**BREACH OF CONTRACT**

68. Waterloo repeats and realleges the allegations contained in the preceding paragraphs.

13

ME1 23362335v.1

69. Waterloo and Plex entered into several valid and binding contracts, including the Agreements (defined above).

70. In the Agreements, Plex contractually agreed that it would not, *inter alia*, disclose, copy, reverse compile, reverse assemble, reverse engineer, or otherwise use Waterloo's confidential and proprietary software system except as expressly permitted under the Agreements.

71. Plex breached the Agreements by using Waterloo's trade secrets beyond the scope of the Agreements, using Waterloo trade secrets and proprietary information to develop Plex's copycat in-house FCS system, and continuing to provide Waterloo's TACTIC software to SFI after terminating SFI's subscription and halting the agreed payment.

72. As a direct and proximate result of Plex's breaches of these Agreements, Waterloo has suffered damages in an amount to be determined at trial.

## COUNT IV
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

73. Waterloo repeats and realleges the allegations contained in the preceding paragraphs.

74. The Agreements between Waterloo and Plex each contain an implied covenant of good faith and fair dealing.

75. Plex breached the covenants of good faith and fair dealing by continuing to use information shared under confidentiality obligations to compete against Waterloo, contrary to the intent of the parties in entering into the agreements.

76. As a direct and proximate result of Plex's breaches of this covenant, Waterloo has suffered damages in an amount to be determined at trial.

77. Plex's breaches have caused and continue to cause Waterloo irreparable harm that cannot be fully redressed through damages alone. An injunction is necessary to provide Waterloo with complete relief.

## COUNT V
## UNJUST ENRICHMENT

78. Waterloo repeats and realleges the allegations contained in the preceding paragraphs.

79. Plex has knowingly copied, reverse engineered, and used Waterloo's proprietary and confidential data structures, algorithms, and other confidential technical information for Plex's own use without Waterloo's permission.

80. Plex has not paid Waterloo for its unauthorized use of Waterloo's proprietary and confidential data structures, algorithms, and other confidential technical information.

81. Plex has been greatly and unjustly enriched by using Waterloo's proprietary and confidential data structures, algorithms, and other confidential technical information in developing its "Plex Finite Scheduling" software.

82. Plex, having obtained the benefit of Waterloo's proprietary and confidential data structures, algorithms, and other confidential technical information to create its copycat "Plex Finite Scheduling" software, has stopped paying Waterloo for SFI's access to TACTIC.

83. Waterloo has suffered as a result of Plex's unjust enrichment, including through the loss of valuable customer relationships, business good will, and revenues.

84. Plex does not have, and has never had, justification for its copying, reverse engineering, and other unauthorized use of Waterloo's proprietary and confidential data structures, algorithms, and other confidential technical information.

85. As a direct and proximate result of the unjust enrichment to Plex, Waterloo has been damaged in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

Waterloo respectfully requests that the Court enter an Order:

A. Finding that Plex has misappropriated the Waterloo Trade Secrets in violation of 18 U.S.C. § 1836;

B. Finding that Plex has misappropriated the Waterloo Trade Secrets in violation of 6 Del. Code Ann. §§ 2001-2009;

C. Finding that Plex's misappropriation of the Waterloo Trade Secrets was willful and malicious;

D. Finding that Plex has breached each of the Agreements;

E. Finding that Plex has breached the covenant of good faith and fair dealing;

F. Finding that Plex has been unjustly enriched through its misappropriation of the Waterloo Trade Secrets and breach of contract;

G. Awarding Waterloo damages for actual losses caused by the misappropriation of the Waterloo Trade Secrets;

H. Awarding Waterloo damages for breach of each of the Agreements in an amount to be determined at trial;

I. Awarding Waterloo exemplary damages for Plex's willful and malicious misappropriation of the Waterloo Trade Secrets;

J. Awarding Waterloo damages caused for Plex's breach of the covenant of good faith and fair dealing;

K. Awarding Waterloo damages in compensation for Plex's unjust enrichment;

L. Permanently enjoining Plex, and its officers, agents, privies, shareholders, principals, directors, licensees, attorneys, servants, employees, affiliates, subsidiaries, successors and assigns and all persons acting on behalf or at the direction of, or in concert or participation with, each of them, and any entity owned or controlled in whole or in part by Plex from taking any action constituting or assisting the misappropriation of Waterloo confidential

      information or Waterloo Trade Secrets, or further breaches of the Agreements; and

M.    Awarding Waterloo all such other and further relief as the Court deems just and proper under the circumstances.

| | |
|---|---|
| Dated: September 21, 2016 | McCARTER & ENGLISH, LLP |
| | |
| | /s/ Daniel M. Silver |
| | Michael P. Kelly (#2295) |
| | Daniel M. Silver (#4758) |
| | Benjamin A. Smyth (#5528) |
| | Renaissance Centre |
| | 405 N. King Street, 8th Floor |
| | Wilmington, Delaware 19801 |
| | (302) 984-6300 |
| | *mkelly@mccarter.com* |
| | *dsilver@mccarter.com* |
| | *bsmyth@mccarter.com* |
| | |
| | *Attorneys for Plaintiffs* |

Of Counsel:

Erik Paul Belt
Wyley S. Proctor
McCarter & English, LLP
265 Franklin Street
Boston, MA 02110
(617) 449-6500
*ebelt@mccarter.com*
*wproctor@mccarter.com*

ME1 23362335v.1